## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **[UNDER SEAL],** | **Civil Action No.** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT AND JURY DEMAND** |
| **[UNDER SEAL],** | **Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** |
| **Defendants.** | |

# FILED UNDER SEAL

# NOT TO BE FILED
# ON PACER

UNITED STATES OF AMERICA *ex rel.* NHCA-TEV, LLC and on behalf of the STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, CITY OF CHICAGO, STATE OF INDIANA, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, CITY OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN,

       Plaintiffs,

v.

TEVA PHARMACEUTICAL PRODUCTS LTD., TEVA PHARMACEUTICAL USA INC., TEVA NEUROSCIENCE, INC., and TEVA SALES AND MARKETING, INC.,

       Defendants.

Civil Action No.

**COMPLAINT AND JURY DEMAND**

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

This is an action brought on behalf of the United States of America by NHCATev, LLC ("Relators"), by and through their attorneys, against Defendants, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* and pursuant to the following State *qui tam* statutes: the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (Deering 2000); the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq.* (2010); the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* (2000); the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* (2000); the Florida False Claims Act, Fla. Stat.§ 68.081 *et seq.* (2000); the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* (2007); the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the City of Chicago False Claims Act, Municipal Code §§ 1-21-010 *et seq.* (2005); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.* (2006); the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* (2007); the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.* (2007); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* (1999); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C- 1 *et seq.* (West 2007); the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (2010); the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.* (2007); the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* (West 2006); the

Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011); and the

Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (2007) ("State

*qui tam* statutes" or "*Qui Tam* States") and alleges the following:

## PRELIMINARY STATEMENT

1.      This is a civil action brought against Teva Pharmaceutical Products Ltd., Teva

Pharmaceutical USA Inc., Teva Neuroscience, Inc., and Teva Sales and Marketing, Inc.

(hereinafter collectively referred to as "TEVA" or "DEFENDANTS") under the False Claims

Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), State *qui tam* statutes and common law to recover

treble damages sustained by, and civil penalties and restitution owed to, the United States

Government as a result of two intertwined, unlawful drug marketing schemes by TEVA.  TEVA

paid tens of millions of dollars to employ coverage specialists and nurses who unlawfully

provided services to prescribers in exchange for a recommendation of TEVA's multiple sclerosis

("MS") drug Copaxone®.   The first scheme involves providing reimbursement support services

by offering free coverage specialists who handled all the insurance determinations, verifications,

and even appeals involved with determining whether Copaxone® would be a covered drug under

the patient's plan thereby relieving prescribers' office staff of this time consuming work.  The

second scheme involves providing free nursing services to the patients of prescribers taking

Copaxone®; thereby relieving prescribers and the prescribers' nurses from time consuming

follow-up care associated with medications administered by injection[1].  These reimbursement

support services are valuable, tangible, "in kind" benefits to providers—typical of unlawful

"quid pro quo" kickback schemes.  As a result of these schemes, pharmacies have and continue

---

[1] Copaxone® was marketed and sold in a 20 mg injectable dosage from 1996 until 2014.  In 2014, TEVA also released a 40 mg dosage of Copaxone® which requires less frequent injections by the patient.

to submit claims to Medicare and Medicaid that were tainted by kickbacks, causing these programs to pay tens of millions of dollars in improper reimbursements.

2.      Defendants' scheme completely undermined the decision making of providers, an important element in Government Healthcare Program coverage policy.  The providers prescribing TEVA's drug Copaxone® did not necessarily do so because they believed, based on their review of peer-reviewed medical literature or discussion with their colleagues, that the drugs would help their patients.  Rather, TEVA's drug Copaxone® was and is often supplied because Defendants actively and improperly pursued and enticed providers with kickbacks.

3.      As a result of these schemes, pharmacies have and continue to submit claims to Medicare and Medicaid that were tainted by kickbacks, causing these programs to pay tens of millions of dollars in improper reimbursements.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.  The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732 (b) because this action is brought under State Laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.S. § 3730.

5.      This Court has personal jurisdiction over Defendants because, among other things, Defendants transact business in this District, and engaged in wrongdoing in this District.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) as well as 28 U.S.C. §§ 1391(b) and 1391(c) because TEVA  transacts business in this District and, in furtherance of its fraudulent kickback schemes, caused to be submitted or conspired to submit false claims in this District.

7.     The causes of action alleged herein are timely brought because, among other things, (a) the conduct has occurred within the last six years and/or within six years of the filing of the original complaint in this action; and/or (b) the efforts by Defendants to conceal from the Unitied States its wrongdoing in connection with the allegations made herein justify tolling; and/or (c) any statutes of limitations have been tolled by operation of the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287.

## PARTIES

### A.     Plaintiff/Relator NHCATev, LLC

8.     Plaintiff/Relator NHCATev is a Delaware Limited Liability Corporation formed for the sole purposes of acting as a Relator in this matter with a principal place of business located in Collingswood, New Jersey.

9.     Relator NHCATev, LLC is an original source of the allegations in this complaint as defined pursuant to 31 U.S.C. § 3730(b)(2) and these allegations are not based upon publically-disclosed information.  NHCATev LLC has provided the Government with material information prior to the filing of this action in accordance with 31 U.S.C. § 3730(b)(2).  The Relator has independent knowledge of the allegations and transactions herein.

10.     The Relator brings this action on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 et seq.

### B.     Defendant Teva Pharmaceutical Products Ltd., Teva Pharmaceutical USA Inc., Teva Neuroscience, Inc., and Teva Sales and Marketing, Inc.

11.     Defendant, Teva Pharmaceutical Products Ltd. (Teva Ltd.) is a world-wide pharmaceutical company engaged in the development, manufacturing, marketing and sale of pharmaceutical products, including specialty medicines, brand and generic prescriptions medications and over-the-counter ("OTC") products, active pharmaceutical ingredients, and

4

novel new therapeutic entities. Teva Pharmaceutical Industries, Ltd. is an Israeli corporation having its principal place of business at 5 Basel Street, P.O. Box. 3190, Petach Tikva 49131, Israel.

12.     Defendant Teva Pharmaceutical USA Inc. (Teva USA) is a pharmaceutical company engaged in the development, manufacturing, marketing and sale of pharmaceutical products, including specialty medicines, brand and generic prescriptions medications and over-the-counter ("OTC") products, active pharmaceutical ingredients, and novel new therapeutic entities.  Teva USA is domiciled in the Commonwealth of Pennsylvania, with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454. Teva USA does business in and throughout the United States, including in the Eastern District of Pennsylvania.

13.     Defendant Teva Neuroscience, Inc., is a division or operating unit of Teva USA, and is domiciled in the State of Kansas with its principal place of business at 11100 Nall Avenue, Overland Park, Kansas 66211. Its principal place of business was formerly at 901 E. 104th Street Suite 900, Kansas City, MO 64131. Teva Neuroscience does business in and throughout the United States, including in the Eastern District of Pennsylvania. Teva Neuroscience markets Teva's Copaxone® drug.

14.     Defendant Teva Sales and Marketing, Inc. is a new legal entity created at the direction of Teva USA and also is a division of Teva USA. Upon information and belief, effective January 1, 2014, all Teva Neuroscience employees were transferred to Teva Sales and Marketing. Upon information and belief, Teva Sales and Marketing is domiciled in the Commonwealth of Pennsylvania, with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454. Teva Sales and Marketing does business in

and throughout the United States, including in the Eastern District of Pennsylvania.  Teva Sales

and Marketing markets Teva's Copaxone® drug.

15.     Defendants, Teva Ltd., Teva USA, Teva Neuroscience, and Teva Sales and

Marketing, are and function as alter egos of each other, as a joint entity, as an integrated

enterprise and/or as agents of each other. At all pertinent times, Teva USA controlled, directed

and supervised the sales and marketing activities of Teva Neuroscience and Teva Sales and

Marketing, which included the marketing of Copaxone®, as well as their employees, and each of

the Defendants is legally responsible for the actionable conduct detailed in this Complaint. At all

pertinent times, the employee and labor relations, as well as the compensation and benefit

activities and the sales and marketing policies and procedures of TEVA have operated from and

through the centralized control of Teva USA, which has established employee and labor

relations, compensation and benefits and sales and marketing policies and procedures for Teva

Neuroscience and Teva Sales and Marketing.

## THE REGULATORY ENVIRONMENT

16.     Pursuant to the Anti-Kickback Statute (AKS), it is unlawful to knowingly offer or

pay any remuneration, in cash or in kind, in exchange for the referral of any product (including a

prescription drug product) for which payment is sought from any Government Healthcare

Program, including Medicare, Medicaid, and TRICARE.

17.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq.* ("AKS"), states as

follows in relevant part:

> (b) Illegal remunerations
>
> (1) Whoever knowingly and willfully solicits or receives any
> remuneration (including any kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind—
> (A) in return for referring an individual to a person for the
> furnishing or arranging for the furnishing of any item or service for

which payment may be made in whole or in part under a Federal
health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or
recommending purchasing, leasing, or ordering any good, facility,
service, or item for which payment may be made in whole or in
part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be
fined not more than $25,000 or imprisoned for not more than five
years, or both.
(2) Whoever knowingly and willfully offers or pays any
remuneration (including any kickback, bribe, or rebate) directly or
indirectly, overtly or covertly, in cash or in kind to any person to
induce such person—
(A) to refer an individual to a person for the furnishing or
arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal health
care program, or
(B) to purchase, lease, order, or arrange for or recommend
purchasing, leasing, or ordering any good, facility, service, or item
for which payment may be made in whole or in part under a
Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be
fined not more than $25,000 or imprisoned for not more than five
years, or both.

18.     For purposes of the AKS, "remuneration" includes the transfer of anything of

value, in cash or in-kind, directly or indirectly, covertly or overtly. Importantly, the statute has

been interpreted to cover any arrangement where one purpose of the remuneration is to obtain

money for referral of services or to induce further referrals.

19.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly

influenced by inappropriate compensation from the pharmaceutical industry.

20.     In accordance with the federal healthcare AKS, applicable regulations directly

prohibit providers from receiving remuneration paid with the intent to induce referrals or

business orders, including the prescription of pharmaceuticals paid as a result of the volume or

value of any referrals or business generated, which results in federal program expenditures. *See*

7

42 C.F.R. § 1001.952(f). Thus, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a Government Healthcare Program. The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company that has, as one of its purposes, inducement of a physician to write additional prescriptions for the company's pharmaceutical products.

21.     Such remunerations are kickbacks when paid to induce or reward physicians for writing prescriptions. Kickbacks increase Government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

22.     The federal healthcare AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the Government Healthcare Programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form resulting in federal program expenditures, regardless of whether the particular kickback actually gives rise to over-utilization or poor quality of care.

23.     The AKS contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protect Defendants from liability for the conduct alleged herein. Compliance with the AKS is a condition of payment under federal

health care programs.

24.    Every Government Healthcare Program requires every provider or supplier to ensure compliance with the provisions of the AKS and other federal laws governing the provision of healthcare services in the United States. Compliance with the AKS is expressly and impliedly required for reimbursement of Government Healthcare Programs federal program claims, and claims made in violation of the law are actionable civilly under the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g) (2010) (a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]....").

25.    The United States has deemed violations of the AKS to be material to its decision to pay health care claims, demonstrated in part through the requirement that providers and suppliers certify compliance with the AKS as a condition of payment under Government Healthcare Programs. If the United States had been aware that the claims discussed herein resulted from conduct that violated the AKS, the United States would not have paid the claims submitted in connection with the Defendants' unlawful conduct.

26.    A violation of the AKS is a violation of the federal FCA. The FCA, 31 U.S.C. § 3729, provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
>
> \* \* \*
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the

9

amount of damages which the Government sustains because of the
act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C).  Within the meaning of the FCA, "knowingly" is defined

to include reckless disregard and deliberate indifference.  *Id.*

27.     The Social Security Act's "intent requirement" was amended in March 2010 as

part of the Patient Protection and Affordable Care Act ("PPACA") to make clear that violations

of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does

"not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148,

§ 6402(h).

28.     In addition to treble damages, the FCA also provides for assessment of a civil

penalty for each violation or each false claim ranging from $5,000 to $10,000.  *See,* 31 U.S.C. §

3729(a).

29.     As detailed herein, TEVA devised schemes whereby it paid in-kind remuneration

to physicians in the form of reimbursement support services and nursing services to patients of

healthcare providers with the specific aim of increasing the usage of Teva's Copaxone® drug.

30.     Knowingly paying kickbacks to physicians to induce them to prescribe a

prescription drug on-label or off-label (or to influence physician prescriptions) for individuals

who seek reimbursement for the drug from a Government Healthcare Program or causing others

to do so, while certifying compliance with the federal healthcare AKS (or while causing another

to so certify), or billing the Government as if in compliance with these laws, violates the FCA

and similar state False Claims Acts.

### AFFECTED HEALTH PROGRAMS

31.     For the drug at issue in this case, generally, when a physician prescribes a drug, a

patient is provided with a prescription that is then filled at a pharmacy. The pharmacy then

submits the claim for payment to the relevant federal health care program(s) for reimbursement.

32.     In certain circumstances, a federal program may also have pharmacy facilities that directly dispense prescription drugs. In such cases, the federal health care program purchases the drug directly rather than reimbursing the pharmacy.

**A.      Medicare**

33.     Medicare is a federal program that provides federally subsidized health insurance primarily for persons who are 65 or older or disabled. *See* 42 U.S.C. §§ 1395, *et seq.* ("Medicare Program"). Part D of the Medicare Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries. Medicare Part D became effective January 1, 2006. All persons enrolled in Medicare Part A and\or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS, through its component agency, CMS, contracts with private companies (or "Part D sponsors") to administer prescription drug plans. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D sponsors enter into subcontracts with many pharmacies to provide drugs to the Medicare Part D beneficiaries enrolled in their plans.

34.     Generally, after a physician writes a prescription for a patient who is a Medicare beneficiary, that patient can take the prescription to a pharmacy to be filled. When the pharmacy dispenses drugs to the Medicare beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D sponsor (sometimes through the sponsor's pharmacy benefit manager, or "PBM"). The pharmacy receives reimbursement from the sponsor (or PBM) for the portion of the drug cost not paid by the beneficiary. The Part D sponsor is then required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event

("PDE"), which contains data regarding the prescription claim, including the service provider of the drug, the prescriber of the drug, the quantity dispensed, the amount it has paid to the pharmacy, and whether the drug is covered under the Medicare Part D benefit.

35.    Payments to a Part D Plan sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments to the Part D Plan sponsor for qualified drug coverage. 42 C.F.R. § 423.322. CMS's instructions for the submission of Part D prescription PDE claims data state that "information …necessary to carry out this subpart" includes the data elements of a PDE. PDE records are an integral part of the process that enables CMS to administer the Part D benefit. Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

36.    CMS gives each Part D sponsor advance monthly payments consisting of the Part D sponsor plan's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low income subsidies. 42 C.F.R. §§ 423.315, 423.329. At the end of the payment year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred. In this reconciliation process, CMS uses the PDE claims data it has received from the Part D sponsor during the prior payment year to calculate the costs the Part D sponsor has actually incurred for prescriptions filled by Medicare beneficiaries under Part D. If CMS underpaid the sponsor for low-income subsidies or reinsurance costs, it will make up the difference. If CMS overpaid the sponsor for low-income subsidies or reinsurance costs, it will recoup the overpayment from the sponsor. After CMS reconciles a plan's low-income subsidy

and reinsurance costs, it then determines risk-sharing amounts owed by the plan to CMS or by CMS to the plan related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a plan's allowable costs exceeded or fell below a target amount for the plan by certain threshold percentages. 42 C.P.R.§ 423.336.

37.     CMS's payments to the Part D sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.P.R.§ 423.315(a).

38.     In order to receive Part D funds from CMS, Part D Plan sponsors, as well as their authorized agents, employees, and contractors (including pharmacies), are required to comply with all applicable federal laws, regulations, and CMS instructions.

39.     By statute, all contracts between a Part D Plan sponsor and the Department of Health and Human Services ("HHS") must include a provision whereby the Plan sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

40.     Medicare Part D Plan sponsors must also- certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. 42 C.P.R.§ 423.505(h)(l).

41.     In accordance with these express statutory and regulatory requirements, all contracts entered into between CMS and Plan D Plan sponsors from 2006 through the present include a provision in which the sponsor "agrees to comply with ... federal laws and regulations designed to prevent ... fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §§ 3729, et seq.), and the anti-kickback statute (§ 1127B(b) of the Act.)"

42.     CMS regulations further require that all subcontracts between Part D Plan sponsors and downstream entities (such as pharmacies and PBMs) contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

43.     A Part D Plan sponsor also is required by federal regulation to certify to the accuracy, completeness and truthfulness of the PDE claims data submitted to CMS. Specifically, the relevant regulatory provision, entitled "Certification of data that determine payment", provides in relevant part:

> (1) General rule. As a condition for receiving a monthly payment under subpart G of this part (or for fallback entities, payment under subpart Q of this part), the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

> (2) Certification of enrollment and payment information. The CEO, ·CFO, or an individual delegated the authority to sign on behalf of one of these officers, and .who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.

> (3) Certification of claims data. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it

14

submits under§ 423.329(b)(3) (or for fallback entities, under§ 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k).

44.     Compliance with the regulatory requirement that the PDE data submitted to CMS is "true, accurate, and complete" is a condition of payment under the Medicare Part D program to the extent that it involves a violation of the AKS.

45.     In accordance with this regulatory requirement, since the Part D program began, Medicare required each Part D Plan sponsor to sign annually an Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor ("Attestation"). This Attestation states:

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and the Medicare Part D Organization(s) listed above, hereafter referred to as the Part D Organization, governing the operation of the contract numbers listed above, the Part D Organization hereby makes the following attestations concerning CMS payments to the Part D Organization:

The Part D Organization attests that based on its best knowledge, information, and belief, the final Prescription Drug Event (PDE) data that have been submitted to and accepted by CMS as of [date] with respect to the Part D plans offered under the above-stated contract(s) for the dates of service of January 1, [prior year] to December 31, [prior year], are accurate, complete, and truthful and reflect all retroactive adjustments of which the Part D organization has been informed by May 30, [current year]. In addition, the Part D Organization attests that based on best knowledge, information, and belief, the payments that have been made by the Part D organization for the claims summarized by the aforementioned PDE data were made in accordance with the coordination of benefits guidance in Chapter 14 of the Medicare Prescription Drug Benefit Manual and other applicable CMS guidance. The Part D Organization attests that based on its best knowledge, information, and belief as ofthe date(s) oflast successful DIR [Direct and

15

Indirect Remuneration Data] [prior year] data submission(s) via the Health Plan Management System (HPMS) as listed above, the final direct and indirect remuneration data submitted to CMS for the Part D plans offered under the above-stated contract(s) for the [prior] coverage year are accurate, complete, and truthful and fully conform to the requirements in the Medicare Part D program regulations and the Final Medicare Part D DIR Reporting Requirements for [the prior year]. The Part D Organization also certifies that based on its best knowledge, information, and belief as of the date indicated below, all other required information provided to CMS to support the determination of allowable reinsurance and risk corridor costs for the Part D plans offered under the above-stated contract(s) is accurate, complete, and truthful. With regards to the information described in the above paragraphs, the Part D Organization attests that it has required all entities, contractors, or subcontractors, which have generated or submitted said information (PDE and DIR data) on the Part D Organization's behalf, to certify that this information is accurate, complete, and truthful based on its best knowledge, information, and belief. In addition, the Part D Organization attests that it will maintain records and documentation supporting said information. The Part D Organization acknowledges that the information described in the above paragraphs will be used for the purposes of obtaining federal reimbursement and that misrepresentations or omissions in information provided to CMS may result in Federal civil action and/or criminal prosecution.

46.     All approved Part D Plan sponsors who received payment under Medicare Part D in benefit years 2006 through the present date submitted these required Attestations in the same or similar format.

47.     Medicare regulations further provide: "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.P.R. § 423.505(k)(3).

48.      Medicare also enters into agreements with physicians to establish the physician's eligibility to participate in the Medicare program. For the physician to be eligible for participation in the Medicare program, physicians must certify that they agree to comply with the Anti-Kickback Statute, among other federal health care laws. Specifically, on the Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me ... The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity

## B.      Medicaid

49.      Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. Each state administers a State Medicaid program. The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A). While drug coverage is an optional benefit, the Medicaid programs of all states provide reimbursement for prescription drugs.

50.      The federal portion of each state's Medicaid payments, known as the Federal

Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent. Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient. The federal government pays to the state the statutorily established share of the "total amount expended ... as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(l).

51.     The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.P.R. § 430.30.

52.     Claims arising from illegal kickbacks are not authorized to be paid under state regulatory regimes.  In fact, providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid

program for services or supplies furnished.

53.     Furthermore, in many states, Medicaid providers, including both physicians and pharmacies, must affirmatively certify compliance with applicable federal and state laws and regulations.

54.     For example, in New York, physicians and pharmacies must periodically sign a "Certification Statement for Provider Billing Medicaid," in which the provider certifies that claims submitted "to the State's Medicaid fiscal agent, for services or supplies furnished, [...]will be subject to the following certification .... I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

## C.     TRICARE

55.     TRICARE, (formerly known as CHAMPUS), is part of the United States military's health care system, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, and military retirees and their\dependents. The military health system, which is administered by the Department of Defense ("DOD"), is composed of the direct care system, consisting of military hospitals and military clinics, and the benefit program, known as TRICARE. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

56.     TRICARE prescription drug benefits are provided through three different programs: military treatment facility outpatient pharmacies, TRICARE network retail pharmacies and TRICARE's mail order service. TRICARE contracts with a PBM to administer

its retail and mail order pharmacy programs. In-addition, TRICARE beneficiaries can also pay

out-of-pocket to fill prescriptions at non-network retail pharmacies, and submit a claim for

reimbursement directly with TRICARE's PBM. The claims process is different for each of these

pharmaceutical programs.

57.     When a TRICARE beneficiary brings a prescription to a TRICARE network retail

pharmacy, for example, the pharmacy submits an electronic claim to the PBM for that

prescription event. The PBM sends an electronic response to the pharmacy that confirms the

beneficiary's TRICARE coverage, and, if the prescription claim is granted, informs the

pharmacy of the calculated pharmacy reimbursement amount and the co-pay (if applicable) to be

collected from the beneficiary. The pharmacy then collects the co-pay amount (if any) from the

beneficiary and dispenses the medication. After a 10-day hold to ensure the prescription was

picked up and not returned to the shelf by the pharmacy, the PBM sends a TRICARE Encounter

Data ("TED") record electronically to TRICARE. The TED record includes information

regarding the prescription event, including the reimbursement amount to be paid to the

dispensing pharmacy. TRICARE then authorizes the PBM to make payment to the pharmacy for

the amount remaining (after co-pay) on the claim. The PBM sends the payment to the pharmacy.

After the payment is made by the PBM's bank, the PBM's bank requests reimbursement from

the Federal Reserve Bank ("FRB"). The FRB then transfers funds to the PBM's bank account.

58.     If the prescription is filled at a non-network retail pharmacy, the beneficiary must

pay the full price of the prescription to the pharmacist and file a claim for reimbursement on DD

Form 2642, TRICARE/DOD.CHAMPUS Medical Claim- Patient's Request for Medical

Payment ("Form 2642"). The Form 2642 is mailed to the PBM. As in the case of reimbursements

under the retail pharmacy program, a TED record is created and sent to TRICARE. TRICARE

then authorizes payment to the TRICARE beneficiary. Upon receiving that authorization, the PBM issues a check to the beneficiary, which is drawn on the PBM's bank account. TRICARE then reimburses the PBM in the same manner as it does under the retail pharmacy program, such that funds are transferred from the FRB to the PBM's bank account.

59. TRICARE beneficiaries can also fill prescriptions through TRICARE's mail order pharmacy program as well. TRICARE beneficiaries submit prescriptions by mail, fax, or electronically to TRICARE's PBM, along with any co-pay (if applicable). TRICARE's PBM delivers the prescription to the beneficiary via free standard shipping. The medications dispensed through the mail order pharmacy program are filled from the PBM's existing inventory of pharmaceuticals. The PBM then requests replenishment pharmaceuticals from DOD's national prime vendor contracted by Defense Logistics Agency ("DLA"). DOD procures the pharmaceuticals through its national prime vendor and replenishes the PBM's inventory of pharmaceuticals after accumulated dispensing reach full package size amounts. The PBM then submits a TED record to TRICARE to obtain administrative fees in connection with that prescription event. DLA bills TRICARE directly for drug replenishment costs.

60. Pursuant to 38 U.S.C. § 8126, pharmaceutical manufacturers are required to enter into national contracts with the DOD pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal Ceiling Price (a price that is calculated as at least 24% less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). Pursuant to DOD's contract with its national prime vendor, the national prime vendor submits an invoice to the DOD for payment of pharmaceuticals supplied to the PBM in connection with the mail order pharmacy program, charging the DOD the price set by the contract awarded by the DOD to the drug manufacturer.

61.     Since March 2003, TRICARE has contracted with a pharmacy benefits manager, Express Scripts, Inc. ("ESI"), to administer TRICARE's mail order pharmacy programs. ESI has also administered TRICARE's retail pharmacy program since June 2004.

62.     Similarly, TRICARE's military treatment facilities purchase medications through procurement contracts with third party pharmaceutical prime vendors. When a TRICARE beneficiary submits an outpatient prescription to a military treatment facility's outpatient pharmacy, the pharmacy purchases the medication from the prime vendor pursuant to an existing procurement contract, and the drug is then dispensed to the patient.

63.     While some physicians enroll in the TRICARE program as network or· participating providers, any physician that is licensed, accredited and meets other standards of the medical community is authorized to provide services to TRICARE beneficiaries. Physicians who are enrolled in the TRICARE network must expressly certify their compliance with TRICARE's regulations. Yet all providers that provide services to TRICARE beneficiaries, whether network providers or non-participating providers, are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.P.R.§ 199.9(a)(4). TRICARE regulations provide that claims submitted in violation of TRICARE's anti-abuse provisions can be denied. *id.* § 199.9(b). Kickback arrangements are included within the definition of abusive situations that constitute program fraud. *Id.* §§ 199.2(b), 199.9(c)(12).

**D.     Veterans Administration Health Care**

64.     The Department of Veteran Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are procured directly by the VA. A VA beneficiary can take a prescription to a VA medical facility, at which point the VA dispenses the medication to the VA beneficiary from its existing inventory. The

VA also supports a mail service prescription program as part of its outpatient drug benefit. VA beneficiaries can submit prescriptions to that mail service program, and the VA then dispenses pharmaceuticals purchased by the VA directly to VA beneficiaries. The VA medical system serves approximately four million veterans.

65.     The VA purchases the pharmaceuticals that it dispenses at its medical facilities and through its mail service prescription program through its Federal Supply Schedule ("FSS") program. Pursuant to 38 U.S.C. § 8126, pharmaceutical manufacturers are required to enter into national contracts with the VA pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal Ceiling Price (a price that is calculated as 26% less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). A VA facility that requires a supply of a particular medication (including a mail order facility) submits a purchase order to the VA's pharmaceutical prime vendor ("PPV") for distribution of pharmaceuticals.  Since May 10, 2004, McKesson Corporation has served as the VA's PPV. The PPV fills the order for the facility, and then submits an invoice to the VA for payment, charging the VA the price set by the contract awarded by the VA to the drug manufacturer. The VA makes payment to the PPV. The PPV then seeks a chargeback from the drug manufacturer for any difference between the contract price paid by the VA and the PPV's acquisition price.

**E.     All Government Healthcare Programs**

66.     Pursuant to the PPACA, among other things, all claims to Government reimbursed programs resulting from a violation of the AKS are also a violation of the FCA.

67.     Moreover, the statutes and regulations set forth above concerning Medicare, Medicaid, TRICARE and Veterans Administration Health Care, when viewed together, state that

healthcare providers must comply with the AKS in order for claims they cause to be submitted to these programs to be reimbursed.  The claims submitted, here, violated the AKS in that these claims stemmed from prescriptions written by providers in exchange for bribes knowing that claims for reimbursement would be submitted to the above programs as a result.  As such, and as more fully discussed below, the prescribing healthcare providers and related suppliers expressly and impliedly falsely certified compliance with the conditions of payment for, at least, Medicare, Medicaid, TRICARE and Veterans Administration Health Care.

68.     In addition to falsely certifying compliance with the AKS, the healthcare providers referred to herein also falsely certified compliance with contractual provisions that were conditions for payment.

69.     As detailed herein, TEVA devised and implemented schemes whereby it gave kickbacks to prescribing providers to recommend Copaxone® and whereby Defendants provided free, in-kind services to these providers to induce them to prescribe Copaxone®.

70.     Knowingly paying kickbacks to induce physicians to prescribe a drug on-label or off-label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal Government health program or causing others to do so, while certifying compliance with the AKS (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA and similar state False Claims Acts.

**DEFENDANTS' FRAUDULENT SCHEMES**

71.     The following sets forth two illegal schemes that TEVA engaged in to expand the sales of its number one drug to treat multiple sclerosis (MS), Copaxone®, for the purpose of increasing TEVA's bottom line at the Government's expense.  Both schemes employed by

TEVA involve "in kind" remuneration provided to prescribers in the form of "reimbursement support" (RS) services.

72.     In the first scheme, Teva provided free coverage specialists to prescribers who recommend Copaxone® who in turn handle all of the time-consuming insurance coverage determinations, verifications and appeals associated with prescribing an expensive drug like Copaxone®.

73.     In the second scheme, Teva provided unlimited free MS nursing services to providers' MS patients who have been prescribed Copaxone®.

**A.      The Covered Drug**

74.     Copaxone® (glatiramer acetate injection) is TEVA's largest and first major branded drug. It was approved by the FDA in 1996. Copaxone® is indicated for the reduction of the frequency of relapses in relapsing-remitting MS. The average annual cost for a Medicare and/or Medicaid patient taking Copaxone® is approximately $60,000, which has risen from less than $10,000 per year when the drug was first launched almost 20 years ago. TEVA has Orange Book-listed patents relating to Copaxone®, which expired in May 2014, as well as a non-Orange Book patent that expired in September 2015.

75.     Copaxone® is considered by TEVA to be one of its leading drugs within its Central Nervous System company portfolio.

76.     Since 2008, Copaxone® has been the market leader in its therapeutic class, with a U.S. market share of approximately 40%.  For example, TEVA's 2016 sales for Copaxone® were enormous with $3.5 billion in sales just in the U.S. market. [2]

---

[2] http://www.marketwatch.com/story/10-k-momenta-pharmaceuticals-inc-2017-02-24

77.     In 2015 alone, Medicare Part D reimbursement for Copaxone® totaled $1.38 billion.[3] A large part of Copaxone®'s blockbuster success can be directly attributed to the un-lawful conduct of Teva detailed herein.

78.     In anticipation of patents relating to Copaxone® expiring in 2014 and 2015, TEVA pushed aggressively to increase the market share for their top selling drug Copaxone® by offering services to doctors who prescribed this drug.

79.     More specifically, in 2012, TEVA began to assemble a team of in-house nurses to provide patient care to Copaxone® patients as well as insurance coverage specialists to aid in determining insurance coverage for this expensive drug.

80.     Around the same time frame, TEVA developed a 40 mg/ml Copaxone® dosage that only required injections three times a week.  TEVA received FDA approval for its 40 mg/ml dosage regimen in January 2014 and began to convert MS patients from daily doses of Copaxone® to three times a weekly dosages of Copaxone®, with the help of the in-house TEVA nurses.

81.     These support services provided to healthcare providers in exchange for them recommending Copaxone®, along with the conversion from once-daily to three-times-weekly Copaxone® successfully had a negative impact on the new generic market for this drug, which threatened TEVA's lucrative Copaxone® revenue.

82.     By the end of 2016, Copaxone®40 accounted for approximately 81% of the overall U.S. glatiramer acetate market (20 mg/ml and 40 mg/ml) based on total prescriptions.

---

[3] ProPublica, https://projects.propublica.org/checkup/drugs/5358, (last visited January 2, 2017)

83.   As set forth below, TEVA's coverage specialists and nursing services, which they provided only if prescribers recommended Copaxone®, served as TEVA's "silver bullet" for maintaining its market share.

**B.    Quid Pro Quo 1: Free Insurance Coverage Specialists as an Inducement to Recommend   Copaxone®[4]**

84.   For the last half a decade, TEVA sales representatives' pitch to providers in this regard has essentially been as follows:

> *Dear Doctor:  If you prescribe our drug (i.e., "recommend" the patient to use our drug), we will give you the services and resources of a full reimbursement support team to manage the process associated with prescribing the drug.  This service will save you the cost and expenses normally associated with managing a patient's prescription and make your practice more profitable.*

85.   This value proposition was a powerful tool in the hands of TEVA's sales representatives and was used to influence providers to recommend its drug Copaxone® over its competitors.  TEVA's sales representatives were able to offer a healthcare provider an "on call" reimbursement support team to manage the patient's Copaxone® prescriptions. RS services became very much a part of the TEVA sales representatives' collective sales pitch.

86.   That is, rather than promoting and marketing its drugs on patient outcomes and efficacy, TEVA introduced an additional incentive to providers to recommend its drugs to patients.  TEVA knew that this service would present a tangible value to the providers.  When that offer was accepted, the provider received the benefits of the RS service without actually having to pay for those services.

**1.    TEVA's Coverage Determination Specialists Provide a Tangible Benefit to Prescribers**

---

[4] The facts contained in Part "B" were uncovered through the investigative diligence of the Relator, which included information provided by the confidential interviewees.

87.     These services are of great value to "office-based" providers who generally derive most of their revenue from billing 15, 30, and 45-minute units of service provided to patients during office visits. The technical term for an office visit is "evaluation- and- management services" or "E/M" for short.

88.     In 2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation.  Medicare pays over $11 billion each year for E/M services alone.  Medicaid and private insurers also pay many more billions each year.

89.     When an office-based provider receives payment for an E/M service given to a patient, part of the payment amount is intended to compensate the provider not only for the actual medical care given to a patient, but also as compensation for other administrative tasks associated with that patient's care.  For example, if a provider receives a $70 payment for an E/M service provided during a routine office visit, a portion of that $70 is intended to compensate the provider for the administrative tasks inherent in managing that patient's care.

90.     Part of the E/M fee is to compensate the provider for tasks associated with prescription drugs.  This compensation flows from the fact that whenever a patient is prescribed a drug following an E/M visit, the provider must attend to the inherent administrative functions associated with that drug prescription, such as: conducting a patient's prescription drug insurance "benefit verification";  determining if the drug is on the formulary lists and tiers; seeking coverage determination; determining co-pays and deductibles; conducting telephone calls to patients; responding to patient complaints; returning messages and faxes; handling prescription

refill requests; and, where necessary, obtaining "prior authorizations"[5] in addition to managing the necessary paper trail.[6]

91.     Office-based providers are not permitted to directly charge patients a fee for writing prescriptions, verifying a patient's drug prescription benefit and/or obtaining any prior authorizations, because the payer-physician contract prohibits charging such fees.  Instead, providers get paid for these services indirectly through the E/M unit charge.

92.     Since a provider's E/M reimbursement for each office visit is fixed per unit, providers are continuously seeking ways to combat overhead costs and expenses in order to earn more profit from each E/M unit billed.

93.     Most importantly, the RS services TEVA was providing resulted in greater profit from each provider's E/M unit charge.  It was in this fashion, giving a provider free RS services, that TEVA "eliminate[d] an expense that [the provider] would have otherwise incurred"[7] if the provider would have had to perform the tasks associated with the Copaxone® drug prescription. Such "in kind" remuneration given to induce a recommendation for a TEVA drug is an unlawful kickback under the AKS.

---

[5] A study of 12 primary care practices published in the Journal of the American Board of Family Medicine put the mean annual projected cost per full-time equivalent physician for prior authorization activities between $2,161 and $3,430. The study's authors concluded that "preauthorization is a measurable burden on physician and staff time." *See,* The Impact of Prior Authorization Requirements on Primary Care Physicians' Offices: Report of Two Parallel Network Studies Christopher P. Morley, PhD, David J. Badolato, MD, JohnHickner, MD, c, and John W. Epling, MD, Ed J Am Board Fam Med January-February 2013 vol. 26 no. 1 93-95
[6] In 2006, primary care providers spent a mean of 1.1 hours per week on authorizations, primary care nursing staffs spent 13.1 hours, and primary care clerical staff spent 5.6 hours, according to a 2009 study published in Health Affairs. The study estimated that the overall cost to the healthcare system of all practice interactions with health plans, including authorizations, was between $23 billion and $31 billion annually. Health Aff (Millwood). 2009 Jul-Aug;28(4):w533-43. doi: 10.1377/hlthaff.28.4.w533. Epub 2009 May 14.
[7] Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731 (May 5, 2003) ("CPG") Section II (2) suspect remuneration as it "eliminate[d] an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)".

94.     Teva referred to this remuneration as "coverage determinations" and/or "reimbursement support services" through a branded term "Shared Solutions"[8] and it was intended to induce providers to choose Teva's Copaxone® over a competitor's drugs.

95.     Teva hired and trained dozens of skilled workers to provide free coverage determination and reimbursement support for Copaxone® prescriptions.  The services included activities like patient insurance benefit verification services, patient prior authorization services, and coverage appeals.

96.     In exchange for prescribing Copaxone®, Teva would assume and underwrite the providers' administrative responsibilities and costs associated with starting a patient on Copaxone®.

97.     The more a provider prescribed Copaxone® as a percentage of its overall prescription volume, the greater the provider's savings, as time and money that would ordinarily be expended by the provider handling a patient's drug coverage and reimbursement issues would now be undertaken by Teva.

98.     TEVA's RS personnel become an extension of the prescribing provider's team. The services the RS personnel provide directly help increase initial and continuing (i.e., refills) drugs sales.

99.     Of course, giving a provider an "extension of their team" is the same as giving a provider a dedicated staff member to exclusively work on administrative tasks associated with TEVA's Copaxone® drug.  Here, TEVA gave providers an *a la carte* single point of contact person to manage the Copaxone® prescription process – which greatly reduced and/or eliminated the providers' overhead and expenses that would otherwise have been associated with

---

[8] Shared Solutions, https://www.copaxone.com/shared-solutions, (last visited August 2, 2016)

any Copaxone® prescription.

> **2.      The Value of the Coverage Determination Specialists to the Prescriber**

100.    TEVA's Copaxone® drug is a very expensive drug that can cost an individual between $50,000 and $60,000 per year.

101.    Prior to prescribing this form of drug therapy, "benefit verification" must be performed to determine the amount of the patients' prescription drug coverage available to pay for the drug.  This process often requires multiple calls and can take up to and sometimes over 45 minutes just to determine the nature and extent of the patient's coverage for Copaxone®.

102.    Teva sales representatives and nurses offer, as part of their sales pitch, to perform this service for the provider's staff if the provider recommends Teva's Copaxone® over its competitors' drugs.

103.    TEVA has developed an integrated system and process run by TEVA employees who have training, education and experience in determining patients' prescription drug benefits, who are known as "verification specialists" (specialists).

104.    First, the specialist verifies the identity of the patient's primary and secondary insurance benefits (i.e., private insurance, Medicare, Tricare, and/or Medicaid).

105.    Next, the specialist directly contacts these carriers and verifies the nature and extent of the patient's drug benefit coverage.  In cases of Medicare and Medicaid, this is called a "coverage determination."

106.    For Medicare patients, a coverage determination is particularly cumbersome and time consuming given the complexity of many Part D plans that have four coverage phases: Deductible phase – where a patient pays 100% for drug costs until the deductible amount is reached; Initial Coverage Limit phase – where a patient would pay a percentage of the cost

depending on the carrier and the drug's formulary position; Coverage Gap, or "donut hole" phase – where patients pay a certain percentage of the drug cost - for example, in 2015, patients would pay 45% of the cost for brand-name drugs and 65% of the cost for generic drugs; and, Catastrophic Coverage phase which kicks in once a patient is out of the coverage gap - so in 2015 a patient paid either 5% of the covered drug cost or $2.65 for generics and $6.60 for brand name drugs.

107.    Teva also offers to perform "prior authorizations" for providers in order to induce the providers to recommend Copaxone® over competitors' drugs.

108.    Part D carriers use the prior authorization process as a means to contain costs associated with expensive medications, such as Teva's Copaxone®.  That is, if a provider wants to recommend expensive drugs like Copaxone®, the Part D carriers will require that providers take the time and effort to "make the case" for prescribing that drug over a cheaper drug.

109.    Prior authorizations are often only valid for a limited time period, such as for one year, and sometimes for only one month.  After that, the provider's staff must start the prior authorization process over again. This can become a particularly time consuming process for a drug like Copaxone® that patients stay on for long periods of time.

110.    TEVA also offers to handle "coverage appeals" when a drug plan either denies coverage or denies the prior authorization request. Teva handles the provider's appeal to the drug plan with the goal of assuming the appeal legwork to reverse the drug plan's denial and to obtain coverage so the patient can either begin or remain on Copaxone®.

111.    Benefit verifications, coverage determinations, prior authorizations and coverage appeals are time consuming and require experienced personnel.

112.    Approximately 90% of providers who prescribed Copaxone® utilized the

reimbursement support services.

113.    Generally, benefit verifications take anywhere from 15 to 45 minutes, while prior authorizations can take anywhere from 1 to 3 weeks.  It would cost a provider about $30,000 to employ someone who could perform the reimbursement services that are provided by Teva for free.

114.    The payer-provider contracts with Medicare, Medicaid, and private insurances prohibit the provider from charging a patient a fee for these administrative services.

115.    TEVA offers providers a means to "outsource" these functions without any direct or indirect cost to the provider – but *only if* the provider chooses to recommend Copaxone® over competitor drugs.

116.    The TEVA RS services resulted in a great value to providers because it eliminated the time and expense of determining and verifying patients' insurance benefits, determining whether a prescribed drug was on formulary and determining co-pays and deductibles.  TEVA'S RS services also saved providers' staff time with phone calls to patients as now TEVA would manage each step and communicate with the patient directly.

117.    TEVA's sales representatives used these reimbursement support services as selling points to induce potential prescribers to recommend Copaxone® over its competitors.

118.    By giving a provider RS services, TEVA gave a tangible "in kind" benefit that greatly reduced and in some instances eliminated a provider's administrative costs related to prescribing TEVA's Copaxone® drug and thus induced providers to choose TEVA's Copaxone® drug over a competitor's drugs.

**C.     Quid Pro Quo 2: Free Nursing Services as an Inducement to Recommend Copaxone®[9]**

119.    In this matter, TEVA employed a force of Clinical MS Nurses ("TEVA Nurses") to work with TEVA's sales force.  TEVA Nurses are all health care professionals who are recognized as specialty clinicians with particular training, education and experience in MS education and care.   Not surprisingly, nurses with this training are in particular demand for providers who care for MS patients.  Many nurses with MS training are employed by primary care and nuerology practices to work with MS patients.  As clinicians with significant training, education and experience, these nurses can command significant compensation in the healthcare workforce.  In this matter, TEVA employed its own MS nurses to unlawfully promote its drugs.

120.    TEVA sought to incentivize MS care providers to choose TEVA's Copaxone® drugs over competitors' drugs by providing free nursing support services.  TEVA identified the unique and particular needs and challenges that MS care providers faced in managing their own practices and patients and began selling these providers "solutions" to those needs and challenges.

121.    Specifically, starting in 2012, TEVA began offering and then providing these providers the time, service and expertise of TEVA employed MS nurses both to help manage providers' MS patients and to provide MS training to the providers' staff.  Of course, in typical quid pro quo fashion in order to be given these services, those providers would have to "support" (i.e., write prescriptions for) TEVA's MS drug, Copaxone®.

122.    TEVA also realized that its potential prescribers (i.e., PCPs and neurologists) were frequently refusing to meet with its sales representatives about TEVA's MS drug Copaxone® so

---

[9] The facts contained in Part "C" were uncovered through the investigative diligence of the Relator, which included information provided by the confidential interviewees.

TEVA used its TEVA Nurses to get information about their Copaxone® drug and the services the nurses provided to potential prescribers.

123.    TEVA nurses were given lists of providers that contained IMS prescribing data. The providers were grouped into three tiers depending on their prescribing habits and TEVA nurses would call these providers directly to tell them about the RS services TEVA offered with the drug and also to discuss the benefits of Copaxone®.   TEVA nurses were able to meet with providers who generally were not willing to meet with sales representatives.

124.    TEVA incentivized its MS nurses to increase the sales of Copaxone® by tying their compensation directly to Copaxone® sales.   TEVA Nurses were compensated with a base salary and a bonus structure based on performance metrics and drug sales.  They had a two-part bonus structure determined by 1) individual meeting metrics evaluated on a quarterly basis and 2) total nationwide Copaxone® sales.  The individual metrics requirements for each nurse were 15 patient programs per year, a certain number of adherence visits with patients, and a minimum of 3 face-to-face meetings with providers per week.  TEVA Nurses could make anywhere between $58,000 to $170,000 per year.

125.    The relator confirmed that MS nurses were viewed by providers as more credentialed and thus more credible than TEVA's sales representatives.   TEVA paid tens of millions of dollars to employ its own MS nursing force. Each TEVA nurse underwent a rigorous TEVA training program and learned sales techniques – similar to the program each TEVA sales representative undergoes.

1.    **Free Nursing Services were Used to Induce Providers to Recommend Copaxone® Over its Competitors**

126.    MS patients are complex, and, often require extra office time and resources to manage their disease.  Providers need to expend time and resources to properly train their staff

how to manage MS patients.

127.     TEVA's nursing support services, which were administered through a network of 70 TEVA employed in-house nurses, ranged from helping providers increase practice efficiency; staff training on healthcare; eliminating the administrative expense of teaching patients; patient management; and, being "on call" to answer patient's medical questions.

128.     These nursing services were provided in typical *quid pro quo* fashion, in order to be given these support services, providers would in turn have to recommend (i.e., write prescriptions) Teva's Copaxone®.

129.     All TEVA nurses went through specific training that included how to promote and sell their services to prospective providers who treat MS patients.  This training included role playing where nurses would learn how to discuss their role and the services they offered if the provider prescribed Copaxone®.

130.     TEVA nurses offered a solution to the time consuming patient management that comes along with patients taking injectable drug therapy by alleviating the need for staffing and training required to manage and train patients taking Copaxone®.

131.     TEVA nurses offered their services to providers by pitching themselves as an extension of the providers healthcare team who was able to train the providers' staff and take on the extra patient management and calls from patients prescribed Copaxone®.

132.     Injectable drugs, such as Copaxone®, can overwhelm providers' offices with calls and follow-up visits concerning the proper way to inject the drug and reactions to the drug such as skin reactions and muscle atrophy.

133.     TEVA nurses were specifically employed to overcome the issues associated with Copaxone® that discouraged providers from prescribing it, such as the fact that it is an injectable

drug requiring patients to be trained on how to self administer it.

134.    Both TEVA sales representatives and TEVA Nurses induced providers to recommend Copaxone® by offering these free nurse services to any patient that was prescribed Copaxone®.

135.    TEVA Nurses would be notified of new patients and track patient adherence through its Shared Solutions program. This infrastructure was provided by TEVA and allowed the prescriber to notify and employ a TEVA Nurse when a new prescription for Copaxone® was recommended.

136.    Once trained and deployed, these TEVA Nurses began to provide free education services to any provider who would prescribe TEVA's Copaxone® drug. The TEVA MS Nurses were successful in saving prescribers' time, money and resources and, in many instances, resulted in receiving higher reimbursement rates associated with certain MS care metrics. Not surprisingly, TEVA also saw its drugs sales increase each time a TEVA Nurse was deployed.

**2.    The Value of the TEVA Nursing Services**

137.    TEVA nurses directly interacted with patients prescribed Copaxone®, which saved providers time and money.

138.    When a patient starts Copaxone® a form is filled out by the provider and entered into Shared Solutions, which is part of TEVA. This process automatically enrolls the patient in the Shared Solutions program and TEVA is notified about the prescription. Once the patient information is processed the patient is contacted by someone from TEVA who tells him/her about the program and what to expect. A TEVA nurse is then contacted by Shared Solutions and provided with the patient information so they can contact the patient directly.

139.    The patient management support provided by TEVA nurses consisted of one-on-

one and/or group sessions[10] between Teva nurses and the providers' patients where the patients were taught general MS disease state information, how to administer Copaxone®, as well as side effect management and injection site rotation.  Teva Nurses would go directly to patients' homes to provide these nursing services.

140.    The services proved by the TEVA nurses had an independent direct value to providers, because otherwise, providers would either have to incur the administrative time and expense to perform the services themselves or hire an extra nurse to perform the service.[11]

141.    TEVA nurses managed patients through education sessions usually in the patient's home, thereby freeing office staff to work in other areas.

142.    Patients and providers were given their assigned TEVA Nurse's telephone numbers in order to relieve the provider's office from handling patient calls, or for providers to request nurse services directly.

143.    The patient education service provided by TEVA Nurses included in-person one-on-one hour sessions for at least a full year.  They would cover important topics such as how to administer the injection, side effect management and injection site rotation.  Many times TEVA Nurses would manage and treat patient side effects caused by the Copaxone® injection.

144.    These one-on-one sessions save providers time and money by relieving the office of the burden of patient education, answering patient calls and questions, and general patient management, including the treatment of side effects.

---

[10] I-1 explained that at some point the administration of Copaxone®'s changed from once per day to three times per week.  After the switch, patients were re-trained in groups as long as all patients consented to the group training.
[11] The annual salary for nurses ranges from $50,000 to $100,000.  Further, a nurse can charge providers on a per diem or contract basis at an average hourly wage of $40.00 per hour.

145.    TEVA Nurses were able to provide 2-3 hours of patient engagement instead of the typical 20 minutes during an office visit.  They also scheduled follow-up visits with the patients and provided patients with their cell phone numbers for them to call with any questions.  TEVA Nurses regularly checked in with Copaxone® patients to avoid patient complacency.

146.    TEVA also had a team of Telehealth nurses who followed-up with patients over the phone and provided MS education and would follow up with patients regarding their medication refills, if none were ordered, in an effort to promote adherence, which, by no coincidence, benefits Teva.

147.    Telehealth nurses performed telephonic patient trainings, which lasted approximately 40 minutes, and also managed patients over the phone.  They were in essence on-call nurses employed by TEVA to help keep patients on Copaxone®, which they are encouraged to stay on indefinitely to prevent relapse.

148.    The Telehealth nurses served to supplement the in-person nursing care provided by TEVA and they were supported by a call center with over 100 people employed by TEVA.

149.    Providers were able to outsource nursing services to TEVA employed nurses for all patients who were prescribed Copaxone®.

150.    Many providers chose to prescribe Copaxone® over its competitors specifically because of the nursing services that were provided along with the drug.

151.    When providers received the benefits of the nurses' service, TEVA "eliminate[d] an expense that  [the provider] would have otherwise incurred"[12] if they employed the nurse or provided the services themselves. [13]

---

[12] CPG Section IIB(2)(b)(B)(1)(b) "…services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the

152.    TEVA unlawfully furnished to providers, through their own in-house nurse force, the services of these nurses to work with the providers' MS patients.  TEVA intended that these nurse services act as an inducement to providers in return for recommending TEVA's Copaxone® to patients.

**D.    Both of TEVA's Quid Pro Quo Schemes Resulted in the Filing of False Claims**

153.    In 2013, there were 10,808 providers who wrote prescriptions for Copaxone® that were filled at pharmacies resulting in 224,167 Medicare Part D Claims that year.  Medicare paid an aggregate cost of $1,120,491,044.47 for these Part D claims.[14]  Many of these claims were tainted by the RS services and the nursing services TEVA offered in exchange for prescribers recommending Copaxone®.

154.    Similarly, in the year 2014, 10,747 providers wrote prescriptions for Copaxone® that were filled at pharmacies resulting in 226,035 Medicare Part D Claims that year.  Medicare paid an aggregate cost of $1,221,012,525.65 for these Part D claims.[15]  Many of these claims were tainted by the RS services and the nursing services TEVA offered in exchange for prescribers recommending Copaxone®.

---

physician)[…] arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer."
[13] Not only do TEVA nurse services eliminate an expense to the provider, but it adds cost to the drug.  When government insurance plans such as Mediare and Medicaid pay for Copaxone®, included in the cost is the cost of a kickback, the TEVA nurse force.
[14] This information was obtained from the publically available Medicare Part D Prescriber National Summary Report, Calendar Year 2013 accessed at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/index.html
[15] This information was obtained from the publically available Medicare Part D Prescriber National Summary Report, Calendar Year 2014 accessed at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/index.html

**DAMAGES**

155.    As TEVA profited from the illegal schemes described in this Complaint,

Medicare and Medicaid were made to bear the costs.  From 2012 to the present, Defendants'

actions knowingly have caused pharmacies, Part D sponsors, fiscal intermediaries and others to

submit billions of dollars in claims to Medicare and Medicaid for TEVA's Copaxone® drug

provided to beneficiaries as a result of Defendants' illegal marketing and *quid pro quo*

arrangements.  Those false claims have caused Medicare and Medicaid to disburse hundreds of

millions or even billions of dollars in reimbursements that should not have been paid.

**SUMMARY**

156.    As is detailed above, the defendants are liable to the federal government for

damages based on the payment of all claims submitted to federal health care programs for

prescriptions written for Copaxone® beginning from the time they began paying remuneration

up through the present because the claims were the result of recommendations induced, in whole

or in part, by remuneration.

157.    Compliance with the AKS is a precondition of payment by virtue of federal and

state statutes, regulations, provider agreements, and contracts.

158.    The certifications and attestations signed by physicians, pharmacies, PBMs and

Part D sponsors certified compliance with the AKS. Kickbacks that were paid to and received by

physicians and other health care professionals to recommend Copaxone® as alleged herein

rendered those certifications and attestations false. Those false statements were material to the

false claims submitted for Copaxone®

159.    Claims for TEVA's Copaxone® arising from the kickbacks expressly and

impliedly misrepresent compliance with a material condition of payment, to wit, compliance

with the AKS. Claims that include items or services resulting from a violation of the AKS constitute false or fraudulent claims under the AKS. 42 U.S.C. § 1320a-7b(b).

160.    By providing remuneration to physicians and other health care professionals, TEVA intended to induce those physicians and other health care professionals, to recommend and/or prescribe their drug, Copaxone®.

161.    It was reasonably foreseeable that some of those prescriptions would be for federal health care program beneficiaries and that claims for those prescriptions would be submitted to federal health care programs. Thousands of such prescriptions or claims based on such prescriptions were, in fact, submitted to and paid for by federal health care program.

## COUNTS

### FIRST COUNT
### FCA 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B) and (a)(1)(C)

162.    Relators re-allege and incorporate by reference the prior paragraphs as though fully set forth herein.

163.    Relators bring these claims on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for knowingly causing to be presented false claims to Government Healthcare Programs.  From on or about 2012 through the present, in this Judicial District and elsewhere throughout the United States, Defendants knowingly and willfully have violated the FCA by causing false claims to be submitted.

164.    As a result of acts described above, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for services that were not eligible for reimbursement for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

165.    Further, as a result of the acts described above, Defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or

fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. §3729(a)(1)(B).

166.   Further, by virtue of the acts described above, Defendants knowingly conspired with each other: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States. Such conduct violates 31 U.S.C. § 3729(a)(1)(C).

167.   Finally, by virtue of the acts described above, Defendants knowingly conspired with each other: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C).

168.   To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator re-alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. §3729(a)(2); and 31 U.S.C. § 3729(a)(3) prior to amendment, by engaging in the conduct complained of herein.

169.   As a direct and proximate result of the Defendants' violation of FCA 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B) and/or (a)(1)(C), the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

170.   Relator respectfully requests this Court enter judgment against the Defendants as follows: (1) that the United States be awarded damages in the amount of the United States'

damages, trebled, as required by law; (2) such civil penalties as are required by law; (3) attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case forward; (4) that Relator be awarded the maximum amount allowed to her pursuant to the federal False Claims Act; and (5) that this Court order such other and further relief as it deems proper

### SECOND COUNT
### California False Claims Act
### Cal. Gov't Code §§ 12650 – 12655

171.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 – 12655.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

172.    Defendants violated the California False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of California as described herein.

173.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of California.

174.    The State of California, unaware of the false or fraudulent nature of these claims, paid such claims which the State of California would not otherwise have paid.

175.    By reason of these payments, the State of California has been damaged, and continues to be damaged, in a substantial amount.

### THIRD COUNT
### Colorado Medicaid False Claims Act
### Col. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-309

176.    This is a claim for treble damages and civil penalties under the Colorado
Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-309.  Relators re-allege
and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

177.    Defendants violated the Colorado Medicaid False Claims Act by engaging in the
fraudulent and illegal practices described herein, including knowingly causing false claims to be
presented to the State of Colorado, as described herein.

178.    As a result of the misconduct alleged herein, Defendants knowingly made, used,
or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or
approved by the State of Colorado.

179.    The State of Colorado, unaware of the false or fraudulent nature of these claims,
paid such claims which the State of Colorado would not otherwise have paid.

180.    By reason of these payments, the State of Colorado has been damaged, and
continues to be damaged, in a substantial amount.

### FOURTH COUNT
**Connecticut False Claims Act for Medical Assistance Programs**
**Conn. Gen. Stat. Ann. §§ 17b-301 *et seq.***

181.    This is a claim for treble damages and civil penalties under the Connecticut False
Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Ann. §§ 17b-301 *et seq.*  Relators
re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

182.    Defendants violated the Connecticut False Claims Act for Medical Assistance
Programs by engaging in the fraudulent and illegal practices described herein, including
knowingly causing false claims to be presented to the State of Connecticut, as described herein.

183.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Connecticut.

184.    The State of Connecticut, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Connecticut would not otherwise have paid.

185.    By reason of these payments, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount.

**FIFTH COUNT**
**Delaware False Claims and Reporting Act**
**6 Del C §§ 1201(a)(1) and (2)**

186.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del C §§ 1201(a)(1) and (2).  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

187.    Defendants violated the Delaware False Claims and Reporting Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Delaware, as described herein.

188.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Delaware.

189.    The State of Delaware, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Delaware would not otherwise have paid.

190.    By reason of these payments, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount.

**SIXTH COUNT**
**District of Columbia Procurement Reform Amendment Act**

**D.C. Code Ann. §§ 2-308.13 – 308.1526[16]**

191.    This is a claim for treble damages and civil penalties under District of Columbia

Procurement Reform Amendment Act, D.C. Code Ann. §§ 2-308.13 – 308.1526.  Relators re-

allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

192.    Defendants violated the District of Columbia Procurement Reform Amendment

Act by engaging in the fraudulent and illegal practices described herein, including knowingly

causing false claims to be presented to the District of Columbia, as described herein.

193.    As a result of the misconduct alleged herein, Defendants knowingly made, used,

or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the District of Columbia.

194.    The District of Columbia, unaware of the false or fraudulent nature of these

claims, paid such claims which the District of Columbia would not otherwise have paid.

195.    By reason of these payments, the District of Columbia has been damaged, and

continues to be damaged, in a substantial amount.

**SEVENTH COUNT**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081 – 68.090**

196.    This is a claim for treble damages and civil penalties under the Florida False

Claims Act, Fla. Stat. §§ 68.081 – 68.090.  Relators re-allege and incorporate the allegations in

the preceding paragraphs as if set forth fully herein.

197.    Defendants violated the Florida False Claims Act by engaging in the fraudulent

and illegal practices described herein, including knowingly causing false claims to be presented

to the State of Florida as described herein.

---

[16] Repealed effective April 8, 2011, and re-codified as D.C. Code Ann. § 2-381.01 *et seq.* without *qui tam* provisions.

198.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Florida.

199.     The State of Florida, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Florida would not otherwise have paid.

200.     By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

### EIGHTH COUNT
### Georgia State False Medicaid Claims Act
### Ga. Code §§ 49-4-168 *et seq.*

201.     This is a claim for treble damages and civil penalties under Georgia State False Medicaid Claims Act, Ga. Code §§ 49-4-168 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

202.     Defendant violated the Georgia State False Medicaid Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Georgia, as described herein.

203.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Georgia.

204.     The State of Georgia, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Georgia would not otherwise have paid.

205.     By reason of these payments, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount.

### NINTH COUNT
### Hawaii False Claims Acts

48

**Haw. Rev. Stat. §§ 661-21 – 661-29**

206.     This is a claim for treble damages and civil penalties under the Hawaii False Claims Acts, Haw. Rev. Stat. §§ 661-21 – 661-29.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

207.     Defendants violated the Hawaii False Claims Acts by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Hawaii, as described herein.

208.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Hawaii.

209.     The State of Hawaii, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Hawaii would not otherwise have paid.

210.     By reason of these payments, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount.

**TENTH COUNT**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1 *et seq.***

211.     This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

212.     Defendants violated the Illinois False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Illinois, as described herein.

213.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois.

214.    The State of Illinois, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Illinois would not otherwise have paid.

215.    By reason of these payments, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount.

## ELEVENTH COUNT
### Indiana False Claims and Whistleblowers Protection Act
### Ind. Code Ann. §§ 5-11-5.5-1 – 5-11-5.5-18

216.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblowers Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 – 5-11-5.5-18. Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

217.    Defendants violated the Indiana False Claims and Whistleblowers Protection Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Indiana, as described herein.

218.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Indiana.

219.    The State of Indiana, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Indiana would not otherwise have paid.

220.    By reason of these payments, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount.

## TWELFTH COUNT
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. §§ 46:437 *et seq.*

221.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

222.    Defendants violated the Louisiana Medical Assistance Programs Integrity Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Louisiana, as described herein.

223.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Louisiana.

224.    The State of Louisiana, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Louisiana would not otherwise have paid.

225.    By reason of these payments, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount.

## THIRTEENTH COUNT
### Maryland False Health Claims Act of 2010
### Md. Code Ann., Health-General §§ 2-601 *et seq.*

226.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-General §§ 2-601 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

227.    Defendants violated the Maryland False Health Claims Act of 2010 by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Maryland, as described herein.

228.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Maryland.

229.    The State of Maryland, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Maryland would not otherwise have paid.

230.    By reason of these payments, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount.

### FOURTEENTH COUNT
**Massachusetts False Claims Law**
**Mass. Gen. Laws Ann. Ch. 12 §§ 5A *et seq*.**

231.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Law, Mass. Gen. Laws Ann. Ch. 12 §§ 5A *et seq*.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

232.    Defendants violated the Massachusetts False Claims Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the Commonwealth of Massachusetts, as described herein.

233.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth of Massachusetts.

234.    The Commonwealth of Massachusetts, unaware of the false or fraudulent nature of these claims, paid such claims which the Commonwealth of Massachusetts would not otherwise have paid.

235.    By reason of these payments, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount.

### FIFTEENTH COUNT
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.601 *et seq.***

236.     This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

237.     Defendants violated the Michigan Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Michigan, as described herein.

238.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Michigan.

239.     The State of Michigan, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Michigan would not otherwise have paid.

240.     By reason of these payments, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount.

### SIXTEENTH COUNT
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01 *et seq.***

241.     This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

242.     Defendants violated the Minnesota False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Minnesota, as described herein.

243.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Minnesota.

244.     The State of Minnesota, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Minnesota would not otherwise have paid.

245.     By reason of these payments, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount.

## SEVENTEENTH COUNT
### Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401 – 17-8-412

246.     This is a claim for treble damages and civil penalties under Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 – 17-8-412.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

247.     Defendants violated the Montana False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Montana, as described herein.

248.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Montana.

249.     The State of Montana, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Montana would not otherwise have paid.

250.     By reason of these payments, the State of Montana has been damaged, and continues to be damaged, in a substantial amount.

## EIGHTEENTH COUNT

54

**Nevada Submission of False Claims to State or Local Government Act**
**Nev. Rev. Stat. Ann. §§ 357.010 – 357.250**

251.    This is a claim for treble damages and civil penalties under the Nevada

Submission of False Claims to State or Local Government Act, Nev. Stat. Ann. §§ 357.010

– 357.250.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if

set forth fully herein.

252.    Defendants violated the Nevada Submission of False Claims to State or Local

Government Act by engaging in the fraudulent and illegal practices described herein, including

knowingly causing false claims to be presented to the State of Nevada, as described herein.

253.    As a result of the misconduct alleged herein, Defendants knowingly made, used,

or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the State of Nevada.

254.    The State of Nevada, unaware of the false or fraudulent nature of these claims,

paid such claims which the State of Nevada would not otherwise have paid.

255.    By reason of these payments, the State of Nevada has been damaged, and

continues to be damaged, in a substantial amount.

**NINETEENTH COUNT**
**New Jersey False Claims Act**
**N.J. Stat. §§ 2A:32C-1 *et seq.***

256.    This is a claim for treble damages and civil penalties under the New Jersey False

Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*  Relators re-allege and incorporate the allegations in

the preceding paragraphs as if set forth fully herein.

257.    Defendants violated the New Jersey False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly causing false claims to be

presented to the State of New Jersey, as described herein.

258.   As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Jersey.

259.   The State of New Jersey, unaware of the false or fraudulent nature of these claims, paid such claims which the State of New Jersey would not otherwise have paid.

260.   By reason of these payments, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount.

**TWENTIETH COUNT**
**New Mexico Fraud Against Taxpayers False Claims Act,**
**N.M. Stat. Ann. §§ 44-9-1 *et seq.***

261.   This is a claim for treble damages and civil penalties under the New Mexico Fraud Against Taxpayers False Claims Act, N.M. Stat. Ann. §§ 44-9-1 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

262.   Defendants violated the New Mexico Fraud Against Taxpayers False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of New Mexico, as described herein.

263.   As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Mexico.

264.   The State of New Mexico, unaware of the false or fraudulent nature of these claims, paid such claims which the State of New Mexico would not otherwise have paid.

265.   By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-FIRST COUNT**
**New York False Claims Act**

**N.Y. State Fin. Law §§ 187 *et seq.***

266.    This is a claim for treble damages and civil penalties under the New York False

Claims Act, N.Y. State Fin. Law §§ 187 *et seq.*  Relators re-allege and incorporate the

allegations in the preceding paragraphs as if set forth fully herein.

267.    Defendants violated the New York False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly causing false claims to be

presented to the State of New York, as described herein.

268.    As a result of the misconduct alleged herein, Defendants knowingly made, used,

or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the State of New York.

269.    The State of New York, unaware of the false or fraudulent nature of these claims,

paid such claims which the State of New York would not otherwise have paid.

270.    By reason of these payments, the State of New York has been damaged, and

continues to be damaged, in a substantial amount.

**TWENTY-SECOND COUNT**
**New York City False Claims Act**
**Admin. Code §§ 7-801 *et seq.***

271.    This is a claim for treble damages and civil penalties under the New York City

False Claims Act, Admin. Code §§ 7-801 *et seq.*  Relators re-allege and incorporate the

allegations in the preceding paragraphs as if set forth fully herein.

272.    Defendants violated the New York False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly causing false claims to be

presented to the City of New York, as described herein.

273.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City of New York.

274.     The City of New York, unaware of the false or fraudulent nature of these claims, paid such claims which the City of New York would not otherwise have paid.

275.     By reason of these payments, the City of New York has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-THIRD COUNT**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 *et seq.***

276.     This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

277.     Defendants violated the North Carolina False Claims Ac by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of North Carolina, as described herein.

278.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of North Carolina.

279.     The State of North Carolina, unaware of the false or fraudulent nature of these claims, paid such claims which the State of North Carolina would not otherwise have paid.

280.     By reason of these payments, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-FOURTH COUNT**

## Oklahoma Medicaid False Claims Act
### Okl. Stat. Title 63 §§ 5053 *et seq.*

281.     This is a claim for treble damages and civil penalties under the Oklahoma

Medicaid False Claims Act, Okl. Stat. Title 63 §§ 5053 *et seq.*  Relators re-allege and incorporate

the allegations in the preceding paragraphs as if set forth fully herein.

282.     Defendants violated the Oklahoma Medicaid False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly causing false claims to be

presented to the State of Oklahoma, as described herein.

283.     As a result of the misconduct alleged herein, Defendants knowingly made, used,

or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the State of Oklahoma.

284.     The State of Oklahoma, unaware of the false or fraudulent nature of these claims,

paid such claims which the State of Oklahoma would not otherwise have paid.

285.     By reason of these payments, the State of Oklahoma has been damaged, and

continues to be damaged, in a substantial amount.

### TWENTY-FIFTH COUNT
### Rhode Island State False Claims Act
### R.I. Gen. Laws §§ 9-1.1-1 *et seq.*

286.     This is a claim for treble damages and civil penalties under the Rhode Island State

False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*  Relators re-allege and incorporate the

allegations in the preceding paragraphs as if set forth fully herein.

287.     Defendants violated the Rhode Island State False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly causing false claims to be

presented to the State of Rhode Island, as described herein.

288.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Rhode Island.

289.    The State of Rhode Island, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Rhode Island would not otherwise have paid.

290.    By reason of these payments, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount.

### TWENTY-SIXTH COUNT
**Tennessee False Claims Act**
**Tenn. Code Ann. §§ 4-18-101 *et seq.***

291.    This is a claim for treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

292.    Defendants violated the Tennessee False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Tennessee, as described herein.

293.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Tennessee.

294.    The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Tennessee would not otherwise have paid.

295.    By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

### TWENTY-SEVENTH COUNT

**Tennessee Medicaid False Claims Act**
**Tenn. Code. Ann. §§ 71-5-181 *et seq.***

296.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §§ 71-5-181 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

297.    Defendants violated the Tennessee Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Tennessee, as described herein.

298.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Tennessee.

299.    The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Tennessee would not otherwise have paid.

300.    By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-EIGHTH COUNT**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132**

301.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132.  Relators re-allege and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

302.    Defendants violated the Texas Medicaid Fraud Prevention Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Texas, as described herein.

303.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Texas.

304.    The State of Texas, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Texas would not otherwise have paid.

305.    By reason of these payments, the State of Texas has been damaged, and continues to be damaged, in a substantial amount.

## TWENTY-NINTH COUNT
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.1 – 216.19

306.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 – 216.19.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

307.    Defendants violated the Virginia Fraud Against Taxpayers Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the Commonwealth of Virginia, as described herein.

308.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Commonwealth of Virginia.

309.    The Commonwealth of Virginia, unaware of the false or fraudulent nature of these claims, paid such claims which the Commonwealth of Virginia would not otherwise have paid.

310.    By reason of these payments, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount.

## THIRTIETH COUNT
### Wisconsin False Claims for Medical Assistance Law
### Wis. Stat. § 20.931

311.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

312.    Defendants violated the Wisconsin False Claims for Medical Assistance Law, by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Wisconsin, as described herein.

313.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Wisconsin.

314.    The State of Wisconsin, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Wisconsin would not otherwise have paid.

315.    By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount.

## THIRTY-FIRST COUNT
### The City of Chicago False Claims Act
### Municipal Code §§ 1-21-010 *et seq.*

316.    This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Municipal Code §§ 1-21-010 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

317.    Defendants violated the City of Chicago False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the City of Chicago, as described herein.

318.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City of Chicago.

319.    The City of Chicago, unaware of the false or fraudulent nature of these claims, paid such claims which the City of Chicago would not otherwise have paid.

320.    By reason of these payments, the City of Chicago has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court enter judgment against the Defendants as follows:

(1) that the United States and/or any State be awarded damages in the amount of the United States' and/or any State's damages, trebled, as required by law;

(2) such civil penalties as are required by law;

(3) attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case forward;

(4) that Relator be awarded the maximum amount allowed to her pursuant to the federal and/or any State's False Claims Act; and

(5) that this Court order such other and further relief as it deems proper.

DATE: *3 May 2017*

ANAPOL WEISS

BY: _____

GREGORY S. SPIZER, ESQUIRE
MELISSA FRY HAGUE, ESQUIRE
ONE LOGAN SQUARE
130 NORTH 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
(215) 790-1130 PHONE
GSPIZER@ANAPOLWEISS.COM
MHAGUE@ANAPOLWEISS.COM


Joseph Trautwein
Joseph Trautwein & Associates, LLC
1777 Sentry Parkway West
Veva Building 11, Suite 100
Blue Bell, PA 19422-2210
Direct 267.464.1540
Cell 215.764.2301
Fax 267.464.0400
jtrautwein@cpmiteam.com